## GENERAL ELECTRIC CO. v. GARRETT COAL CO.

(Circuit Court, W. D. Pennsylvania. November 6, 1905.)

### No. 35.

PATENTS—INFRINGEMENT—REGULATOR FOR ELECTRICAL DRIVEN MACHINERY.

The Knight and Potter patents, Nos. 587,441 and 587,442, one for a method of regulating electrically driven machinery, and the other for an apparatus for applying such method, are not infringed by an apparatus in which a dead resistance is continuously used in changing the connection between the two motors used from series to multiple, whereas in the method and apparatus of the patents it is entirely cut out at one stage of the transition.

In Equity. On final hearing.

Betts, Betts, Sheffield & Betts, for complainant.
Glenn S. Noble, for respondent.

BUFFINGTON, District Judge. This is a bill in equity brought by the General Electric Company against the Garrett Coal Company, charging infringement of claims 1 and 2 of patent No. 587,441, granted to its assignors, Walter H. Knight and William B. Potter, on August 3, 1897, for a regulating apparatus for electrically driven mechanism, and of claims 3, 4 and 9 of patent No. 587,442, granted to its said assignors the same day, for a method of regulating electrically driven machinery. Without entering into a statement of the art and the technical terms herein employed, we content ourselves with noting the conclusions we draw from a study of the case. In traction practice, wherein infringement is here alleged, it was fully recognized prior to these patents that a trolley car could best be operated by the use of two motors con-

nected in series for slow, and in multiple for high, speeds. If a single motor was used, there was no way to control its power and speed except by putting more or less dead resistance in series with it to regulate the current to which it was subjected. But the use of such resistance is highly objectionable, for, as stated by complainant's expert:

"Under such circumstances the counter electro-motor force of the motor at slow speeds would be small, while the dead resistance would be large, and the impressed electro-motive force of the trolley wire would be wastefully consumed in bearing the dead resistance, and only to a small degree consumed usefully in overcoming the counter electro-motive force."

The practice, therefore, is to use two motors and supplement them by a minimum of dead resistance, and, by series or multiple connections, secure two extremes of speed under economic conditions. But the difficulty of changing from series to multiple relation with a second motor, or vice versa, lies in the electric arc produced by breaking the circuit, or in the sudden rush of heavy current incident to the connecting of a slow moving motor, with its slight counter electro-motive force, to a trolley wire with its great impressed electro-motive force. To meet these difficulties the patents in suit—one a method, the other an apparatus for applying such method—were addressed. Their manner of doing so is shown in the figures and specifications of the patents:

"Referring to the drawings which accompany this specification, figures 1 to 9 show in diagram the several combinations of circuits which are produced in succession in the practice of our method according to the manner we have found best suited for use in connection with the service for which it is particularly adapted, to wit, the control of railway cars operated by two electric motors. * * * Referring to the diagrams in figures 1 to 9, it will be observed that in figure 1, which represents the first condition of motor circuits established by the switch, the two motors are out of action, and there are two breaks in the circuit—one between the trolley, T, and resistance, R; and the other between the armature, Aa, of the motor, A, and the field magnet, Bf, of the motor, B. The first step in the series is to close the latter of these two breaks, when the two motors will be in series, as shown in figure 2, but still disconnected from the trolley. The second step is to close the remaining break, when the

condition will be as shown in figure 3. This condition is the first one in which a complete circuit is made, and it gives the lowest rate of speed; the two motors being in series with each other and with a resistance. The third step is to short circuit the resistance, when the condition shown in figure 4 is produced, giving a higher rate of speed, although it is to be understood it is also of importance that the resistance be adapted to prevent the sudden influx of an undue volume of current at the moment the circuit is completed. The fourth step introduces the resistance once more, as shown in figure 5, and the fifth completes a shunt-circuit around one of the motors, to wit, motor, D, as appears in figure 6. With these two steps the process of gradually changing the motors from series to multiple begins. The shunting of one motor is a preparation for its entire removal from the series connection, and it acts at the same time to connect the unshunted motor directly to the main line circuit, which is the connection it has when in multiple; but the effect of this change is modified by the reintroduction of the resistance, which prevents an undue degree of acceleration in speed, and protects the unshunted motor from injury by an undue volume of current. The sixth step, continuing the series multiple change, produces the condition indicated in figure 7, in which the circuit of the shunted motor is severed, so that no current passes therein, while at the seventh step this motor is connected in multiple with its mate, which, it will be observed, has continued its active operation; the resistance at the same time being short-circuited. This completes the change of motor connections, and the two motors which were formerly in series without resistance are now in multiple without resistance, as the resistance has performed its designed function of assisting in the changing-over process, which by its aid has been accomplished gradually and safely. The eighth and last step is one which we have provided for giving an extra rate of speed to the motors in multiple, and this is accomplished by shunting the field magnets of the two motors through a suitable resistance, as is indicated in figure 9. The above-described series of circuit combinations provides for several and distinct rates of speed, between which the conditions may be regarded as more or less temporary and transitional. Thus the first rate of speed will be given by the condition in figure 3, the second by the condition in figure 4, the third by the condition in figure 6, the fourth by the condition in figure 8, and the fifth by the condition in figure 9."

Now, the use of dead resistance as a motor protection was not first disclosed by this patent. What was disclosed was its use at the particular times or stages therein pointed out in order to effect motor change from series to multiple. This will be seen from the patentees' statements in the specifications. Thus in the apparatus patent it is said: ·

"The result of this organization is to establish connection between the successive pairs of contact-plates 1 and 2, 3 and 4, etc.; in any predetermined sequence the connection being maintained for a predetermined length of time between the plates of each pair, and finally interrupted at a predetermined period."

And the method patent, after describing the several steps says:

"This completes the change of motor connections, and the two motors which were formerly in series without resistance are now in multiple without resistance, as the resistance has performed its designed function of assisting in the changing-over process, which by its aid has been accomplished gradually and safely."

The patentees, then, having disclosed no new elements in their apparatus, the novelty of their disclosure is to be looked for in a new use of known agents. This we assume they did, and we next ascertain just what that use was. Passing down to figure 4, we start with the two motors in series and with the resistance cut out. In stages 5

and 6 it is cut in the transition from stage 6 to stage 8; the resistance is cut out entirely in stage 7. This intermittent use and disuse of this important factor of dead resistance is clearly pointed out in the specification, and is carried into the claims quoted below, which describes the entire process step by step. Thus the specification says:

"In Figs. 5 and 6 the resistance is first cut in, and then one motor is shunted; the other motor being left in series with the resistance only. In Figs. 7 and 8 one terminal of the motor, B, is disconnected from the circuit and reconnected to the corresponding terminal of the other motor, so that the two are in multiple while the resistance is cut out."

And the claim is:

"(2) In an apparatus for regulating the power and speed of mechanism driven by two electric motors, the combination of two motors, and a switch for placing them in series with each other and with a resistance, the switch provided with contacts and connections adapted to cut out the resistance, for one rate of speed, to again cut in the resistance, to shunt one motor, to disconnect one motor and cut out the resistance, and to connect the two motors in multiple."

It will thus be seen that in the transition stage, 7, there is no dead resistance to counteract the current. In the reverse transition the break of the current would, owing to the absence of resistance, cause sparking, which is alleged to be disastrous and is conceded to be objectionable, and the testimony would indicate the complainant later adopted a construction in type K, which obviated this sparking in type J which embodied the apparatus of the patent. In that regard complainant's expert says:

"The K controller reduced somewhat such sparking as tended to occur in controller J in passing back from position 8 to position 5, through the intermediate positions 6 and 7. * * * It is probable that the reduction of the sparking was one of the objects in producing the new controller."

We have noted these things, not with a view to minimize the patent, but simply to emphasize the fact that the patentees during one stage of the only method they pointed out wholly eliminated the factor of dead resistance, and that this omission was not a mere minor, unimportant detail, but was a substantial, functional feature in the apparatus and the method they disclosed. Now, in the respondent's apparatus and method the dead resistance is used in every stage of the change of the motors from series to multiple and vice versa. It is true their method accomplishes the same object as does complainant's, viz., a change from series to multiple, but it is accomplished in a different way, to wit, by a continuous instead of a noncontinuous use of dead resistance. Complainant's expert, with commendable frankness, recognizes the difference between the two methods. When asked if he found in respondent's apparatus "a condition to that shown in figure 7 of the patent drawings—that is, with one motor cut out and the other motor in circuit without resistances"—he says:

"No; the defendant keeps the protecting resistance in circuit during the entire change from series to multiple and from multiple to series."

And when asked:

"Do you consider there is any advantage derived from keeping this resistance in the circuit while making these changes?"

He replied:

"Yes; I think it is better to keep it in during the entire change."

While this difference is thus shown to exist, it is sought to minimize its significance by the fact that stage 7 is not a working condition, but a rapid, instantaneous transition. / But we must remember we are dealing with an apparatus whose purpose is rapid change; that is, not only to accomplish change in conditions, viz., from series to multiple and vice versa, but in doing so it must provide for an instantaneous adjustment, if a powerful current, to changing conditions in load, grade, or other factors. Dealing, as the apparatus does, with such a powerful agent as an electric current of great volume, and one whose good or ill effects are effective even in the transitory instant of the swiftest mechanical change of a controller, it will be seen that it is in the fact and nature of change, and not in the time employed in making it, that the real significance of such change lies. In view, then, of the fact that respondent has found another way of accomplishing the change from series to multiple connection from that disclosed by complainant's patent, that in its method it employs the constant, uninterrupted use of dead resistance, it would seem that this difference is one of substance, and we are of opinion the patent should not be so construed as to cover a method which is not only not disclosed in the patent, but in the point where it does differ from the patent, viz., in the constant use of dead resistance, it may be said in that regard to be a departure from the teaching and spirit of Knight and Potter's method. To hold otherwise would be to make the patent laws a means to discourage and not "to promote the progress of science and useful arts."

Finding, therefore, as we do, that respondent's device neither employs the method or uses the apparatus disclosed by Knight and Potter in their patent, we are of opinion that the charge of infringement cannot be sustained, and a decree may be drawn dismissing the bill.